## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRIENDS OF THE EARTH<br>1101 15th Street, NW<br>11th Floor<br>Washington, DC 20005<br><br>SIERRA CLUB<br>2101 Webster Street, Suite 1300<br>Oakland, CA 94612<br><br>HEALTHY GULF<br>935 Gravier Street, Suite 700<br>New Orleans, LA 70112<br><br>          *Plaintiffs*,<br><br>     v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY<br>1200 Pennsylvania Avenue, NW<br>Washington, DC 20460<br><br>U.S. ARMY CORPS OF ENGINEERS<br>441 G Street NW<br>Washington, DC 20314<br><br>          *Defendants*. | Case No.: _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Friends of the Earth, Sierra Club, and Healthy Gulf (collectively the "Conservation Organizations") file this Complaint for Declaratory and Injunctive Relief against the U.S. Environmental Protection Agency ("EPA") and the U.S. Army Corps of Engineers ("Corps"), and allege as follows:

## INTRODUCTION

1.      This case challenges the unlawful decisions by EPA and the Corps to approve the construction and operation of a massive pumping station that would drain some of the richest wetland and aquatic resources in the Nation.  The late Senator John McCain called this pumping project "one of the worst projects ever conceived by Congress," while EPA decisively vetoed the project under the Clean Water Act during the George W. Bush Administration to prevent unacceptable adverse impacts to wetlands, wildlife and fisheries.

2.      That longstanding veto protects vital resources in the Yazoo Backwater Area of Mississippi, including one of the few remaining intact bottomland hardwood forested wetlands in the Lower Mississippi River Alluvial Valley.  Periodic flooding of this sparsely populated area sustains a highly productive floodplain fishery and hemispherically significant migratory bird foraging grounds.  A staggering sixty percent of all bird species in the United States use the Yazoo Backwater Area, including twenty-nine million migratory birds and forty percent of the Nation's waterfowl population.

3.      EPA safeguarded the Yazoo Backwater Area in 2008 by exercising its authority under Section 404(c) of the Clean Water Act to veto the construction and operation of a pumping station (hereinafter the "Yazoo Pumps") with a capacity of 14,000 cubic feet per second (cfs).  After a robust public process and extensive examination of a comprehensive administrative record, EPA issued a Final Determination (the "Veto") prohibiting the Yazoo Pumps, as well as

every alternative proposed by the Corps that included a pumping station, so as to prevent

"unacceptable adverse effects" to more than 28,400 acres of wetlands in an area that provides

essential habitat to more than 450 species of birds, fish, and wildlife.

4.      EPA Headquarters in Washington D.C. has issued only thirteen vetoes since the Clean

Water Act was enacted in 1972, out of approximately two million activities approved by the

Corps under the Clean Water Act during that timeframe.  EPA Headquarters is closely involved

in veto decisions, including to ensure consistency and to set precedents for future guidance.

5.      Despite the Veto, the Corps has repeatedly pushed to construct and operate the Yazoo

Pumps.  In 2020, the Corps proposed a modified plan for the Yazoo Pumps that moved the

pumping station approximately eight miles east of the previously proposed site.  EPA

Headquarters concluded that the modified plan violated the Veto.  EPA Headquarters further

reiterated the Veto's warning that derivatives of the Yazoo Pumps that do not reduce impacts

below the level prohibited by the Veto, such as derivatives that modified the Pumps' location or

operational features, would still violate the Veto.

6.      In 2024, however, the Corps proposed an even more destructive plan for the Yazoo

Pumps (the "2024 Plan").  The 2024 Plan would almost double the size of the pumps (and their

pumping capacity) from 14,000 cfs to 25,000 cfs, making the Yazoo Pumps one of the largest

hydraulic pumping stations in the world.  The 2024 Plan calls for operating those massive pumps

in a way that would degrade at least 92,867 acres of wetlands, as acknowledged by EPA—an

area more than twice the size of Washington, D.C.  Estimates also show that the 2024 Plan could

cost taxpayers upwards of two billion dollars.

7.      The 2024 Plan plainly violates the terms of the Veto.  The 2024 Plan would harm more

than three times as many wetland acres as deemed unacceptable by the Veto and contrary to the

Clean Water Act.  Moreover, the 2024 Plan's much larger version of the Yazoo Pumps, by its very design, involves the same discharges of dredge and fill material for the same structures at the same location prohibited by the Veto.

8.      Yet, on January 15, 2025, EPA Headquarters sent a letter and enclosed attachment advising the Corps that the Veto "does not apply to the 2024 Plan for the Yazoo Pumps Project" despite explicitly acknowledging that the plan would cause "total wetland impacts . . . within the range" deemed unacceptable by the Veto and contrary to the Clean Water Act (hereinafter, the "2025 Decision").  By brushing aside the 2024 Plan's unacceptable adverse impacts, EPA overlooked those critical facts and entirely failed to consider the Veto and Section 404(c)'s dispositive factor.  That "head-in-the-sand" approach is arbitrary, capricious, and contrary to law.  *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 931 (D.C. Cir. 2017).

9.      EPA's 2025 Decision is a final agency action subject to review under the Administrative Procedure Act as it sets forth EPA's final position on the applicability of the Veto to the 2024 Plan and allows the Corps to approve construction and operation of the 2024 Plan in direct violation of the Veto.

10.      In fact, just eleven days after the 2025 Decision, the Corps issued a Record of Decision ("ROD") approving the 2024 Plan for the Yazoo Pumps.  The Corps' ROD likewise violates the Veto.

11.      In addition to violating the Veto, the Corps failed to demonstrate that the 2024 Plan is the "least environmentally damaging practicable alternative"—a threshold requirement of the Clean Water Act.  In fact, the Corps refused to consider a less environmentally damaging proposed alternative that it received via comments and stakeholder meetings many times.  That proposal, known as the Resilience Alternative, could be implemented quickly through existing federal

programs to provide prompt, effective, sustainable, and environmentally sound flood relief to communities in the Yazoo Backwater Area.

12.    The Corps also refused to consider significant and unacceptable adverse impacts of the Yazoo Pumps, thereby violating the National Environmental Policy Act.  Though the Corps prepared an Environmental Impact Statement (the "2024 FEIS"), it failed to analyze the 2024 Plan's reasonably foreseeable effects on fisheries, native birds, amphibians, and reptiles, thereby vastly underestimating the project's impacts.  The 2024 FEIS also failed to analyze the 2024 Plan's unacceptable adverse impacts in the context of the significant cumulative loss of wetlands in the Yazoo Backwater Area, thereby ignoring the very real risk that the Yazoo Pumps will be the proverbial "straw that breaks the back of the environmental camel."  *Hanly v. Kleindienst*, 471 F.2d 823, 831 (2d Cir. 1972).

13.    The Corps compounded these errors by refusing to obtain an independent external peer review, a process Congress mandates to safeguard against uninformed decision-making for water resource projects as costly and controversial as the Yazoo Pumps.

14.    To remedy these errors, the Conservation Organizations seek vacatur of EPA's 2025 Decision and the Corps' ROD, along with appropriate declaratory and injunctive relief.

### JURISDICTION AND VENUE

15.    This action arises under the Clean Water Act, National Environmental Policy Act, Section 2034 of the 2007 Water Resources Development Act (as amended), and Administrative Procedure Act.  This Court has jurisdiction over the parties and subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. §§ 2201–02 (declaratory judgments).

16.    Venue is proper in the District of Columbia under 28 U.S.C. § 1391 because Plaintiffs have offices and members in the District of Columbia, and a substantial part of the events giving

rise to the claims in this Complaint occurred within the District of Columbia.  This includes significant involvement by EPA Headquarters in both the initial decision to veto the Yazoo Pumps, the 2021 Decision that the Veto prohibits modifications to the Yazoo Pumps that do not reduce impacts below the prohibited levels, and the challenged 2025 Decision which contends that the Veto does not apply to the 2024 Plan for the Yazoo Pumps.

## PARTIES

### I.     Plaintiffs

17.     Friends of the Earth is a nonprofit organization with a headquarters in Washington, D.C. Friends of the Earth is a membership organization consisting of nearly 294,000 members, and more than 4.9 million activists nationwide.  Friends of the Earth's mission is to protect our natural environment, including air, water, and land, and to create a more healthy and just world. Friends of the Earth utilizes public education, advocacy, legislative processes, and litigation to achieve its organizational goals.  For over twenty years, Friends of the Earth has opposed the Corps' attempts to construct the Yazoo Pumps, including in comments opposing the Corps' most recent proposal.  Instead, Friends of the Earth has urged the Corps to support highly effective non-structural, natural, and nature-based flood risk reduction solutions as also requested by many local community leaders.

18.     Sierra Club is a non-profit organization with approximately 2.2 million members and supporters. Established in 1892, Sierra Club has offices nationwide, including in Washington, D.C. Sierra Club's mission is to explore, enjoy, and protect the wild places of the earth; to practice and promote responsible use of the earth's ecosystems and resources; and to educate and encourage the public to protect natural resources. Sierra Club has long advocated against the Corps' attempt to construct and operate a pumping plant in the Yazoo Backwater Area because of the unacceptable adverse impacts on fish and wildlife and water quality.  Instead, Sierra Club has

advocated for non-structural alternatives, such as the Resilience Alternative, that would provide marginalized communities with equitable, just flood relief and long-term protections. This advocacy has included the submission of comments, appearance at public hearings, public education, and publication of issue papers.

19.     Healthy Gulf, formerly known as the Gulf Restoration Network, is a twenty-nine-year-old environmental non-profit organization focused on the health of the Gulf of Mexico, its wetlands and waters, and the communities dependent upon them.  The organization empowers people to protect and restore the natural resources of the Gulf of Mexico region, often assuming a "watchdog" role.  The organization has actively commented on the Yazoo Pumps for decades, and engaged in organizing efforts to protect wetlands there.  It advocated against filling and degrading wetlands to construct and operate a pumping station, and proposed instead non-structural flood control alternatives less disruptive to wetland habitats, soils, streams and wildlife in the Yazoo Backwater Area. Healthy Gulf's members frequently visit the Yazoo Backwater Area to enjoy its ecological richness and biodiversity through activities such as hunting, hiking, paddling, and bird-watching, all of which would be adversely impacted by the proposed pumping plant.

20.     The Conservation Organizations have long opposed the Corps' attempts to construct and operate the Yazoo Pumps due to the unacceptable adverse effects on some of the Nation's most valuable wetlands, wildlife, and fishery resources.  The Conservation Organizations participated extensively in the Corps' administrative process leading up to the 2024 FEIS, including by commenting on the scoping notice and draft EIS, and even commenting on the FEIS before the Corps issued its ROD.

21.    The Conservation Organizations have long advocated for non-structural and natural infrastructure solutions—including such things as conservation and flood easements, wetland restoration, flood proofing or elevation of structures, elevation of low-lying road segments, voluntary purchase of flood-prone properties, and voluntary relocations—to reduce flood risks and increase community resilience in the Yazoo Backwater Area.  The Conservation Organizations provided the Corps and EPA with a detailed alternative proposal, the Resilience Alternative, which includes a suite of proven, affordable, natural infrastructure and non-structural measures that would provide prompt, effective, sustainable, and environmentally sound flood relief to communities in the Yazoo Backwater Area while providing ecological benefits.  Yet, the Corps flatly refused to consider this alternative, and instead insisted on constructing an even larger pumping station that would cause wetland impacts far in excess of the amount deemed unacceptable by the Veto and contrary to the Clean Water Act.

22.    The Conservation Organizations' members have a long-standing connection to the Yazoo Backwater Area, which they regularly use for outdoor recreation, such as hunting, hiking, paddling, photography, and wildlife watching.  They will be adversely and irreparably harmed by EPA and the Corps' decision to construct and operate the Yazoo Pumps.  For example, their members, including but not limited to Friends of the Earth member Billy Mitchell, Sierra Club member Louie Miller, and Healthy Gulf member Andrew Whitehurst, visit the state and federal lands in the Yazoo Backwater Area to participate in annual bird count surveys, explore the area's unique bottomland hardwood forests and other wetlands, watch and photograph the rich array of species that inhabit the area, and engage in other recreational activities.  Each of these members has specific intentions to continue to visit the Yazoo Backwater Area and interact with the species that depend on the area's wetlands and aquatic resources.  The 2024 Plan would,

however, cause wide-spread, large-scale, and unacceptable damage to wetlands in the Yazoo

Backwater Area that support its wildlife and fisheries resources.  That damage would impair

these members' activities in the Yazoo Backwater Area, such as bird watching, wildlife

photography, recreation, and hunting.  These harms are actual and concrete, and would be

remedied by the relief sought in this case.

## II.    Defendants

23.    EPA is a federal agency headquartered in the District of Columbia.  EPA made the illegal

2025 Decision that the 2024 Plan is not subject to the longstanding Clean Water Act Veto.

24.    The Corps is a federal agency headquartered in the District of Columbia.  The Corps

made the illegal decision to approve the 2024 Plan for the Yazoo Pumps.

### LEGAL BACKGROUND

## I.    Clean Water Act

25.    Congress enacted the Clean Water Act in 1972 with the objective to "restore and maintain

the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

26.    Congress established several goals for the act, including attainment and preservation of

"water quality which provides for the protection and propagation of fish, shellfish, and wildlife."

*Id.* § 1251(a)(2).

27.    To further these goals, Congress prohibited the "discharge of any pollutant" into

navigable waters except in accordance with the Clean Water Act.  *Id.* § 1311(a).

28.    Congress granted the Corps authority to issue permits for the discharge of dredged or fill

material under Section 404 of the Clean Water Act.  *Id.* § 1344.  Section 404(a) allows the Corps

to "issue permits, after notice and opportunity for public hearings for the discharge of dredged or

fill material into the navigable waters at specified disposal sites."  *Id.* § 1344(a).

29.     The Clean Water Act directs the Corps to evaluate sites for the discharge of dredged or fill material "[s]ubject to subsection (c) of this section" and "through the application of guidelines developed by the [EPA] Administrator." *Id*. § 1344(b).  Accordingly, before granting a Section 404 permit or approving one of its own water resources projects, the Corps must satisfy both the Section 404(b)(1) Guidelines—the binding regulations developed by EPA in conjunction with the Corps—and any restrictions on discharges established through Section 404(c) by EPA.

30.     The Corps must evaluate its own water resource projects under the environmental criteria set forth in the Clean Water Act Section 404(b)(1) Guidelines.  *See* 33 C.F.R. Part 320; 40 C.F.R. Part 230.  The Guidelines explicitly apply to the Corps when it seeks to approve its own water resources projects.  33 C.F.R. § 336.1(a).

31.     The Guidelines prohibit the Corps from authorizing any discharge of dredged or fill material if a "practicable alternative to the proposed discharge" would have "less adverse impact on the aquatic ecosystem."  40 C.F.R. § 230.10(a).

32.     Section 404(c) of the Clean Water Act grants the EPA Administrator the authority to preclude or override the Corps' decision to issue a Section 404 permit or authorize its own project to dredge or fill jurisdictional waters.  33 U.S.C. § 1344(c).  Section 404(c) is commonly referred to as EPA's "veto authority."  Congress granted this authority to EPA in recognition of its role as the "environmental conscience" of the Clean Water Act.  Denial or Restriction of Disposal Sites; Section 404(c) Procedures, 44 Fed. Reg. 58,076, 58,081 (Oct. 9, 1979).

33.     Section 404(c) authorizes the EPA Administrator to "prohibit the specification . . . of any defined area as a disposal site" for the discharge of dredged and fill material "whenever [EPA] determines" that the discharge "will have an unacceptable adverse effect on . . . fishery areas (including spawning and breeding areas), wildlife," and other enumerated resources.  33 U.S.C.

§ 1344(c).  To "prohibit specification" of a disposal site means "to prevent the designation of an area as a present or future disposal site."  40 C.F.R. § 231.2(b).

34.     A Section 404(c) veto has two core components.  First, the veto sets forth EPA's determination that a proposed project would cause an "unacceptable adverse effect" to enumerated resources, including wetlands and fisheries.  *See* 33 U.S.C. § 1344(c).  Second, the veto identifies the "discharge" of dredged and fill material that is prohibited by the veto to prevent those unacceptable adverse effects from occurring.  *Id.*

35.     EPA's regulations define an "unacceptable adverse effect" to include an "impact on an aquatic or wetland ecosystem which is likely to result in . . . significant loss of or damage to fisheries, shellfishing, or wildlife habitat or recreation areas."  40 C.F.R. § 231.2(e).  EPA is to consider both direct and secondary impacts in determining whether an adverse effect is unacceptable.

36.     EPA's regulations set forth a rigorous process to ensure that the Administrator exercises the authority to veto a project consistent with the "unacceptable adverse effect" standard and after an opportunity for public comment.  *Id.* § 231.3(a).

37.     EPA's regulations centralize the decision-making process with EPA Headquarters in Washington D.C. "to ensure consistency and to set some precedents for future guidance."  Denial or Restriction of Disposal Sites; Section 404(c) Procedures, 44 Fed. Reg. 58,078, 58,081 (Oct. 9, 1979).

**II.     National Environmental Policy Act**

38.     Congress enacted the National Environmental Policy Act to "promote efforts which will prevent or eliminate damage to the environment."  42 U.S.C. § 4321.

39.     To fulfill Congress's twin aims of comprehensive environmental analysis and broad, informed public involvement, federal agencies must prepare a detailed statement, known as an environmental impact statement ("EIS"), for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).

40.     That detailed statement must analyze the "reasonably foreseeable environmental effects of the proposed agency action." *Id.* § 4332(2)(C)(i).  It must also rigorously and objectively evaluate "a reasonable range of alternatives to the proposed agency action."  *Id.* § 4332(C)(iii).

**III.     Water Resources Development Act**

41.     Congress has enacted multiple laws establishing the policies, procedures, and programs applicable to the development, construction, and operation of federal water resources projects by the Corps, and to authorize the study and construction of federal water resources projects.

42.     At issue in this case is the provision in these laws that requires the Corps to subject "project studies" for water resource projects to "a peer review by an independent panel of experts." 33 U.S.C. § 2343(a)(1).  The statute defines a "project study" as both "(A) a feasibility study or reevaluation study for a water resources project . . . and (B) any other study associated with a modification of a water resources project that includes an environmental impact statement, including the environmental impact statement prepared for the study." *Id.* § 2343(k)(1).

43.     An independent external peer review is mandatory if the project's total costs, including mitigation costs, exceed $200 million or if the project is "controversial."  *Id.* § 2343(a)(3)(A)(i), (iii).  A project is controversial if "there is a significant public dispute as to the size, nature, or effects of the project" or "there is a significant public dispute as to the economic or environmental costs or benefits of the project."  *Id.* § 2343(a)(4).

44.     In all cases, the peer review must be carried out concurrently with the project study and must be completed "not more than 60 days after the last day of the public comment period for the draft project study," unless the Chief of Engineers determines that more time is necessary.  *Id.* § 2343(b)(1), (e)(1).

## IV.     Administrative Procedure Act

45.     The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

46.     An agency's decision is arbitrary and capricious if it has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

47.     The Supreme Court has held that the Administrative Procedure Act requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Id.* (internal citation omitted).

## FACTUAL BACKGROUND

### I.     The Yazoo Backwater Area Sustains Some of the Nation's Richest Wetland and Aquatic Resources.

48.     The Lower Mississippi River Alluvial Valley once supported twenty-five million acres of forested wetlands that extended along both sides of the Mississippi River from Illinois south to Louisiana and the Gulf of Mexico, as depicted in the figure below.



**Figure 1: Location of the Yazoo Basin in northwestern Mississippi (Klimas et al. 2011:2)**

49. Over the past hundred years, however, both flood control projects and land clearing for agriculture have eliminated approximately eighty percent of the bottomland forested wetlands in the Lower Mississippi River Alluvial Valley. These landscape-scale changes have fundamentally altered wildlife habitat and reduced the biological diversity and integrity of this vital ecosystem.

50. The Yazoo Basin in northwestern Mississippi contains one of the last existing and most substantial tracts of highly productive bottomland hardwood forested wetlands in the Lower Mississippi River Alluvial Valley. The portion of this area relevant to the Yazoo Pumps— referred to throughout this Complaint as the Yazoo Backwater Area—"lies in west-central Mississippi between the mainline Mississippi River east bank levee and the hill line on the east," which comprises about 926,000 acres, as depicted below.



51.    The Yazoo Backwater Area contains some of the richest wetland and aquatic resources in the Nation, including a highly productive bottomland hardwood forest and a floodplain fishery that supports at least fifty-eight different species of fish.

52.    The Yazoo Backwater Area is also a globally significant migratory bird foraging ground located in the heart of the Mississippi Flyway—a major continental migration corridor that funnels birds through the midcontinent from as far north as the Arctic Circle and as far south as South America, as depicted below.

14



53.     The Yazoo Backwater Area provides significant habitat to 257 bird species, including 60 percent of all North American bird species that depend on the Mississippi River basin, 40 percent of the Nation's waterfowl, and numerous species recognized as federally and/or state threatened or endangered.  More than 29 million birds use the Yazoo Backwater Area each year, including 9.4 million shorebirds.

54.     In total, the Yazoo Backwater Area provides vital habitat supporting more than 450 species of birds, fish, and wildlife.

55.     The stunning biodiversity of the Yazoo Backwater Area is largely a product of the area's complex floodplain hydrology.  The hydrologic cycle of water moving from the area's rivers and streams onto the floodplain—known as the flood pulse—fuels the fundamental biological processes essential to wetlands, fish, and wildlife productivity.

56.    EPA has identified hydrology—which includes water depth, flow patterns, and the duration and frequency of flooding—as the single most important determinant of wetland types and functions.  Even small alterations in wetland hydrology can produce significant, ecosystem-wide changes in species composition and richness and in ecosystem productivity.

57.    Federal and state agencies have spent many millions of dollars to conserve the vital floodplain ecosystem in the Yazoo Backwater Area.  As a result, the area contains at least 250,000 acres of conservation lands, including nationally significant public lands.

**II.    The Corps Proposes the Yazoo Pumps.**

58.    The Corps has constructed multiple large-scale flood control projects in the Yazoo Backwater Area, including a system of levees, channels, and flood gates that have greatly reduced flood levels in the Yazoo Backwater Area during flood events on the Mississippi and Yazoo Rivers.  These include the Mississippi River Mainline Levee and the Yazoo Backwater Levee which provide significant reductions in flood levels in the Yazoo Backwater Area.  The Steele Bayou flood control structure provides additional important flood level reductions.  When high water stages occur on the Mississippi River, those high flows can cause the Mississippi and Yazoo Rivers to back up into the Yazoo Backwater Area.  To minimize those backups, the Corps constructed the Steele Bayou flood control structure, which includes gates that can be closed to prevent flows from backing up into the Yazoo Backwater Area.

59.    In 2007, the Corps released a Final Supplemental Environmental Impact Statement ("2007 FSEIS") that proposed construction and operation of a pumping station in the Yazoo Backwater Area to drain water, primarily from low-lying agricultural lands, during certain types of flood events to facilitate increased agricultural production on those lands (known as the "Yazoo Pumps").

60.     The primary component of the Yazoo Pumps alternatives evaluated in the 2007 FSEIS was a 14,000 cfs pumping station that would be constructed near the Steele Bayou flood control gates.  The pumping station would pump surface water out of the Yazoo Backwater Area when the Steele Bayou flood gates were closed.

61.     The 2007 FSEIS evaluated five alternative operating plans for the proposed pumping station ("2007 Plans" 3 through 7).  The five alternatives varied with respect to pump-on-elevation (the elevation of water levels at which the pumps would turn on), non-structural features (such as conservation measures), and operating plans for the Steele Bayou flood control gates.

62.     Operating the pumping station would cause large-scale hydrological alterations to the aquatic ecosystem in the Yazoo Backwater Area, including alterations to the water depth, flow patterns, and the duration and frequency of flooding.  The 2007 FSEIS, however, analyzed the impacts of the pumping station on only a small subset of wetlands in the Yazoo Backwater Area. Even that unduly constrained analysis showed that the recommended pumping station and various alternatives evaluated would degrade the ecological functions provided by at least 28,400 to 118,400 acres of wetlands in the Yazoo Backwater Area.

**III.    EPA Headquarters Vetoes the Yazoo Pumps.**

63.     In 2008, EPA exercised its authority under Clean Water Act Section 404(c) to veto the Yazoo Pumps due to the unacceptable adverse impacts on fishery areas and wildlife.

64.     EPA Headquarters was closely involved in the Section 404(c) veto process due to Headquarters' role as decision maker on any final action to prohibit or restrict the Yazoo Pumps. Headquarters staff attended public hearings, visited the project area, met with a Congressional delegation, and carried out a final consultation process with the Corps and local project sponsors.

Both the EPA Administrator and Assistant Administrator for the Office of Water were involved in the process.

65.    On August 31, 2008, EPA's Assistant Administrator for the Office of Water signed the Final Determination vetoing the Yazoo Pumps.

66.    The Veto contains two principal components.  First, the Veto determines that adverse impacts to more than 28,400 acres of wetlands would be unacceptable and contrary to the Clean Water Act.  Second, the Veto prohibits the discharges of dredged and fill material for purposes of construction of the Yazoo Pumps.

**A.    The Veto Identifies the Amount of Wetland Impacts Prohibited by the Veto.**

67.    The Veto is based on EPA's determination that the construction and subsequent operation of the Yazoo Pumps would adversely impact at least 28,400 acres of wetlands, thereby causing unacceptable adverse impacts to fisheries and wildlife.  The Veto and its technical appendices document these and other findings in 287 single-spaced pages of analysis that include the results of EPA's own field surveys, hydrological modeling, review of the scientific literature, and detailed responses to public comments.

68.    Accordingly, the Veto prohibits a range of operating plans proposed by the Corps (i.e., the 2007 Plans 3 through 7) because they would adversely impact at least 28,400 acres of wetlands in the Yazoo Backwater Area.  The Veto deemed that level of impacts to wetlands "significant," "unacceptable," and not "consistent with the Clean Water Act."

69.    The Veto further explains that the "adverse effects associated with the prohibited projects are a result of a combination of operational factors including the capacity of the pumping station and its associated pump-on elevations."  The Veto thus warns the Corps that "derivatives of the prohibited projects that involve only small modifications to the operational features or location of these proposals would also likely result in unacceptable adverse effects and would generate a

similar level of concern and review by EPA."  To that end, the Veto explicitly identified the "range of impacts" to wetlands—that is, impacts to over 28,400 acres of wetlands—as "significant and unacceptable."

70.    Consistent with these statements, EPA also vetoed a modified plan proposed by the Corps (2007 Modified Plan 6) because it "retain[ed] the 14,000 cfs pumping station" and despite "modifications to the pump-on elevation" it would nevertheless adversely impact "between 28,408 and 48,066 acres" of wetlands, thereby exceeding the amount deemed unacceptable.

71.    In addition, the Veto demonstrates that the 2007 FSEIS severely underestimated the impacts to wetlands, fisheries, and aquatic habitat in the Yazoo Backwater Area by considering the proposed pumps' impacts on only a small subset of wetlands.  Based on its own analysis in the Veto, EPA concluded that the proposed pumps would degrade an additional 24,000 acres of wetlands, which amplified EPA's concerns about the unacceptable adverse impacts of the Yazoo Pumps.  These "additional impacts" did not, however, alter the level of impacts deemed unacceptable by the Veto.  Rather, the Veto reiterated that "our analysis relies on the adverse impacts to between approximately 28,400 – 118,400 acres of wetland impacts (i.e., the range of wetland impacts associated with the prohibited projects) as identified in the FSEIS."  The Veto deemed that "range of impacts" unacceptable and contrary to the Clean Water Act because it "would [] result in unacceptable adverse effects on wetlands and their associated fisheries and wildlife resources in the Yazoo Backwater Area."

**B.    The Veto Prohibits Discharges of Dredged and Fill Material for Purposes of Construction of the Pumping Station.**

72.    The second component of the Veto prohibits the discharge of dredged or fill material for the purposes of "construction" of the Yazoo Pumps.

73.    As explained in the Veto, the "primary component of this project is a 14,000 cubic feet per second (cfs) pumping station, near the Steele Bayou flood control gates." According to the Corps' design, construction of the pumping station requires the discharge of dredged and fill material for "an inlet channel, outlet channel, pump station, and site work."

74.    The Corps proposed six alternatives for the Yazoo Pumps (2007 Plans 3 through 7, and Modified Plan 6), each of which included the same discharges of dredge and fill material for the purposes of constructing a 14,000 cfs pumping station.

75.    To prevent the unacceptable adverse impacts caused by the operation of a 14,000 cfs pumping plant structural feature, EPA issued a Final Determination—the Veto—that prohibits the specification of wetlands in the Yazoo Backwater Area as a disposal site for the discharge of dredged or fill material for the purpose of construction of 2007 Plans 3 through 7, and Modified Plan 6.

IV.    **EPA Repeatedly Urges the Corps to Consider Available Alternatives to the Yazoo Pumps.**

76.    The Veto was a priority of the George W. Bush Administration's EPA and Department of the Interior, both of which believed there were less environmentally damaging ways to reduce flood damage in the Yazoo Backwater Area.

77.    The Veto sought to advance those solutions by foreclosing construction of the proposed pumping station in the Yazoo Backwater Area (the "structural" feature) while urging the Corps to obtain an independent peer-reviewed study of the full range of alternatives to address flood management.

78.    Before and since issuing the Veto, EPA and the public have repeatedly urged the Corps to consider non-structural alternatives to the Yazoo Pumps, such as the Resilience Alternative.

79.    In 2014, EPA declined the Corps' request to withdraw or modify the Veto, and instead restated its willingness to explore alternatives that would be more sustainable than the pumps.

80.    In 2015, EPA again declined the Corps' request to subject the Veto to further review because such an approach would be "inconsistent with the law" and would do little to identify cost-effective and technically feasible flood protection.

81.    In August 2019, EPA refused to reevaluate the Veto because the purportedly updated wetlands analysis that the Corps provided to EPA failed to fix the errors in the 2007 FSEIS, which severely underestimated the impacts to wetlands and fisheries.  EPA also reiterated its obligation to provide an opportunity for public notice and comment prior to its consideration of any request to alter a final veto.

**V.    The Corps Proposes a Plan to Modify the Location of the Yazoo Pumps.**

82.    In 2020, the Corps issued a notice of its intent to "complete the Yazoo Area Pump Project feature."  The Corps developed a plan for the Yazoo Pumps that retained the 14,000 cfs pumping station (the "2020 Plan").  Furthermore, the Corps acknowledged that the 2020 Plan would degrade more than 38,774 acres of wetlands, which exceeds the level prohibited by the Veto due to the unacceptable adverse impacts on wildlife and fisheries.  The Corps, however, moved the pumping station to a nearby location at Deer Creek, which is approximately eight miles east of the Steele Bayou water control structure.

83.    In a November 30, 2020, letter, EPA's Region IV Administrator concluded that the 2020 Plan was "not subject" to the Veto.  The Regional Administrator asserted that the 2020 Plan was not subject to the Veto primarily because "the 14,000 cfs pump will now be located near Deer Creek approximately eight miles east of the Steele Bayou site at issue in the 2007 FSEIS."  The

Regional Administrator refused to consider the fact that the 2020 Plan would cause unacceptable adverse impacts in violation of the Veto.

84.     A coalition of conservation groups filed a lawsuit in 2021 challenging EPA's decision as arbitrary, capricious, and contrary to the Veto and Clean Water Act.  Among other things, the lawsuit alleged that EPA unlawfully disregarded the 2020 Plan's adverse impacts to wetlands, which exceeded the amount prohibited by the Veto.

85.     EPA subsequently agreed to reconsider its November 30, 2020, decision.

86.     On November 17, 2021, after a comprehensive review of the Veto and administrative record, EPA concluded by letter that the 2020 Plan was in fact subject to the Veto (the "2021 Letter").  EPA reiterated that "derivatives of the prohibited projects" that "do not result in significant reductions in the environmental impacts of the project . . . would also likely result in unacceptable adverse impacts" prohibited by the Veto.

**VI.    The Corps Proposes an Even More Destructive Plan for the Yazoo Pumps.**

87.     In 2024, the Corps finalized an Environmental Impact Statement ("2024 FEIS") for the Yazoo Backwater Area Water Management Project.  The recommended plan (the "2024 Plan") expands on the original design of the 14,000 cfs pumping station by adding additional pumping units that almost double its capacity to 25,000 cfs.  The 2024 Plan also recommends operating the pumps at levels that EPA confirmed would adversely impact at least 92,867 acres of wetlands in the Yazoo Backwater Area.

        **A.    The 2024 FEIS Failed to Demonstrate the 2024 Plan is the Least Environmentally Damaging Practicable Alternative.**

88.     The 2024 FEIS identified the basic project purpose as providing "a flood risk reduction solution for the [Yazoo Backwater Study Area] communities and the local economy while avoiding and minimizing impacts to important environmental resources."

89.     The 2024 FEIS considered in detail only two alternatives, both of which recommend expanding the Yazoo Pumps' capacity to 25,000 cfs.

90.     Alternative 2 recommends an operating plan with different pump-on elevation levels for "crop season" and "non-crop season". During the Alternative 2 crop season (defined by the Corps as March 16 – October 15) the pumps will be turned on (the "pump-on" elevation) when water levels reach 89.5 feet to keep water from exceeding the 90-foot elevation level. During the non-crop season (October 16 – March 15), the pump-on elevation will be 92.5 feet to keep water from exceeding the 93-foot elevation.

91.     Alternative 3 recommends an operating plan with the same pump-on elevations but modifies the dates of the crop and non-crop seasons. Alternative 3 has an operating plan with a pump-on elevation of 89.5 feet during the crop season (March 25 – October 15) and 92.5 feet during the non-crop season (October 16 – March 24).

92.     The Corps designated Alternative 3 (the 2024 Plan) as the least environmentally damaging practicable alternative.

93.     The FEIS Main Report does not provide information on the acreage of wetlands adversely impacted by the 2024 Plan. Instead, that information is provided in Table 53 of Appendix F-3 (Wetlands), which demonstrates that Alternative 3 would adversely impact 92,867 acres of wetlands. EPA relied on that figure in its 2025 Decision, acknowledging that Alternative 3 (the 2024 Plan) would adversely impact 92,867 acres of wetlands, which falls within the range prohibited by the Veto.

94.     The 2024 FEIS does not consider the Resilience Alternative proposed by the Conservation Organizations, even though it meets the basic project purpose. The Resilience Alternative identifies a suite of non-structural and nature-based solutions (in lieu of the pumps)

23

that can be used in combination to reduce flood risk, including elevating and flood-proofing homes, businesses and roads; carrying out voluntary relocations and buyouts; protecting targeted areas with floodplain easements; and engaging with Yazoo Backwater farm owners to expand conservation easements and related wetland restoration. The Resilience Alternative also avoids impacts to wetlands, and thus is presumptively less environmentally damaging than Alternatives 2 and 3 evaluated in the 2024 FEIS.

95.    In comments on the 2024 draft EIS, local community leaders urged the Corps to "quickly implement nature-based and non-structural solutions that can help us recover and thrive" and "address the substantial needs of our low-income, minority communities[.]"

96.    The 2024 FEIS did not consider, let alone analyze, the Resilience Alternative.

97.    The 2024 FEIS eliminated from consideration a "non-structural" alternative that looked solely at voluntary acquisition of structures and croplands up to the 98.2-foot elevation. The 2024 FEIS deemed this "non-structural" alternative as impracticable based on four unsubstantiated assertions that disregard the Resilience Alternative's suite of solutions.

98.    First, the 2024 FEIS asserted that non-structural measures "would likely result in economic losses that conflict with the project's purpose of supporting the region's economic stability and growth." The Corps provided no support for this sweeping assertion. In fact, the Corps refused to provide any economic analysis to justify this statement.

99.    Second, the 2024 FEIS asserted that voluntary acquisitions would be ineffective due to "lower-than-expected participation" rates. The 2024 FEIS provided no support for this assertion about participation rates nor did the Corps undertake any survey of residents in the Yazoo Backwater Area to support this assertion. Furthermore, the Corps did not consider any of the multiple federal programs detailed in the Resilience Alternative that could be used to help

maximize participation rates, and did not consider the full suite of actions that would work collectively to protect homes and businesses that opted not to participate in voluntary buyouts.

100.    Third, the 2024 FEIS relied on a conclusory assertion that "significant portions" of the backwater area would remain unprotected by non-structural solutions due to "ineligible structures." However, the Corps did not provide any support for this assertion and in fact admitted that it had not even evaluated whether structures are ineligible.

101.    Fourth, the 2024 FEIS asserted that a non-structural solution "disproportionately impacts low-income communities" and "environmental justice communities." But the record directly refuted this statement. In comments responding to the draft EIS, local community leaders urged the Corps to "quickly implement nature-based and non-structural solutions that can help us recover and thrive" and "address the substantial needs of our low-income, minority communities." These community leaders also rejected the Corps' narrow-minded insistence on the Yazoo Pumps, explaining that community members "are not fooled by the false claims that the Yazoo Pumps are the only solution to protect us from flooding." Community leaders have called the Yazoo Pumps a "slap in face to Black community members of the Yazoo Backwater Area" given the project's "true purpose" which "is to help already rich farm owners get even richer by planting more crops on their large low-lying farms while the needs and requests of Black community members continue to be ignored."

   **B.    The 2024 FEIS Failed to Consider the 2024 Plan's Reasonably Foreseeable Effects on Fisheries, Native Birds, Amphibians, and Reptiles.**

102.    The Yazoo Backwater Area contains some of the richest natural resources in the nation, including a highly productive floodplain fishery and hemispherically significant habitat for millions of migratory and resident birds. Overall, the Yazoo Backwater Area supports 257

species of birds, over 58 species of fish, 48 species of mammals, 37 species of reptiles, and 21 species of amphibians.

103.    The 2024 Plan would reduce the duration, spatial extent, depth, and frequency that project area wetlands flood.  These hydrological alterations would adversely impact the spawning, rearing and foraging habitat of backwater-dependent fish, including by limiting or cutting of access to floodplain habitat.  These hydrological alterations would also adversely impact bird species that depend on bottomland hardwood wetlands and other key habitats and their associated flood regime for fulfillment of specific life cycle requisites, including during the breeding and migrating seasons.  Further, these hydrological alterations would adversely impact amphibians and reptiles by disrupting their reproductive cycles and feeding opportunities and thereby reducing overall productivity.

      **1.**     **The 2024 FEIS Failed to Analyze the 2024 Plan's Adverse Impacts on Fisheries as Required by the Veto.**

104.    As documented in the Veto, fish in the Yazoo Backwater Area depend on overbank flooding (i.e., flooding out of the normal stream channel) between March and June to access vital habitat in the two-year floodplain[1] and above for spawning and rearing.  That overbank flooding "provides access to protective spawning and nursery habitat for the species which utilize backwater areas outside the stream channels where larger predatory fish species live."

105.    The Yazoo Pumps would, however, limit this essential overbank flooding by reducing or "shaving off" the flood peaks that provide access to that crucial spawning and rearing habitat in the floodplain.  The Veto thus underscores the need (and the Corps' failure in the 2007 FSEIS) to

---

[1] The "two-year floodplain" refers to the portion of the floodplain that has a fifty percent chance of being flooded in any given year.

analyze the Yazoo Pumps' impacts on those flood peaks and the subsequent loss of critical spawning and rearing habitat in the floodplain, including habitat in the two-year floodplain and above.

106.    The 2024 FEIS failed to assess the 2024 Plan's impacts on any spawning and rearing habitat in the two-year floodplain and above.  The 2024 FEIS overlooked those significant impacts based on two errors.

107.    First, the 2024 FEIS assessed the impacts of the 2024 Plan on only the "mean stage" of fish spawning and rearing habitat in the Yazoo Backwater Area.  But analyzing the pumps' impacts on the "mean stage" (i.e., average water levels) does not capture the pumps' far greater impacts on the flood peaks that provide access to critical spawning and rearing habitat in the two-year floodplain and above.

108.    Second, the 2024 FEIS compounded this error by assessing the 2024 Plan's impacts on a "mean stage" that was "less than the 1-year elevation" (i.e., lower than the one-year floodplain). In fact, the "mean stage" used by the Corps as the baseline for assessing the 2024 Plan's impacts was over eight feet *below* the two-year floodplain.  The 2024 FEIS then only assessed the 2024 Plan's impacts on spawning and rearing habitat that occurs below that baseline "mean stage" (i.e., below the one-year floodplain).  This means that the 2024 FEIS did *not* assess impacts to any spawning and rearing habitat in the two-year floodplain or above.

109.    Even the 2024 FEIS's paltry analysis of impacts to fish spawning and rearing habitat is wrong.  As documented in the Veto, spawning fish depend on at least fourteen days of continuous overbank flooding to a minimum depth of one foot in the floodplain from March to May.  It is thus essential to analyze how often and when operation of the Yazoo Pumps would result in the loss of fourteen consecutive days of flooding.  Despite this clear direction from the Veto, the

2024 FEIS considered impacts to fish spawning using only an eight-consecutive-days parameter—an approach rejected by the Veto because "eight days is insufficient for any substrate spawning fish to spawn."

### 2.    The 2024 FEIS Failed to Analyze the 2024 Plan's Adverse Impacts on Millions of Birds.

110.    The FEIS failed to analyze the 2024 Plan's impacts on fish spawning and rearing habitat in the one- and two-year floodplains and above.  That led to a severe underestimate of the 2024 Plan's impacts on fisheries, which infects the 2024 FEIS's subsequent analysis of impacts to many species including the approximately 2.8 million shorebirds that migrate through the Yazoo Backwater Area in the spring and depend on its fisheries and flooded habitats.

111.    The 2024 FEIS also failed to assess the 2024 Plan's impacts on millions of migratory waterfowl that rely on the Yazoo Backwater Area.  During the spring migration (March through mid-April), over 1.49 million waterfowl migrate through the Yazoo Backwater Area.  During the fall migration, over 1.32 million waterfowl migrate through the Yazoo Backwater Area.  Yet, the 2024 FEIS did not assess the impacts of the 2024 Plan during those crucial timeframes.  Instead, the 2024 FEIS limited its assessment to the 2024 Plans' impacts on winter waterfowl habitat when waterfowl have different energetic needs and when the 2024 Pumps would likely not be operating.

112.    In addition, the 2024 FEIS failed to assess the 2024 Plan's impacts on breeding waterfowl, particularly resident Wood ducks and Hooded mergansers.  The 2024 Plan would draw down water levels during the spring breeding season in years when the pumps are operating, thereby adversely impacting food resources and habitat for breeding species.  The 2024 FEIS, however, did not analyze those impacts and instead restricted its analysis of waterfowl impacts to the overwintering period of November 1 through February 28.

### 3. The 2024 FEIS Failed to Analyze the 2024 Plan's Significant Impacts on Amphibians and Reptiles.

113.    The 2024 FEIS did not assess the 2024 Plan's significant impacts on the extensive array of reptiles and amphibians that rely on the Yazoo Backwater Area, virtually all of which depend on the backwater area's wetlands and flood pulses.

114.    As documented in the Veto, the Yazoo Backwater Area supports an extensive array of amphibians and reptiles that depend on the backwater area's wetlands and flood pulses. There are twenty-one species of amphibians (e.g., frogs, toads, salamanders) which have been documented as occurring in the project area. There are also thirty-seven species of reptiles documented as occurring in the project area, most of which are snakes and turtles. All of the twenty-one amphibians, and thirty-two of the thirty-seven species of reptiles, depend on the Yazoo Backwater Area's flood pulses, including for the provision of wetland habitat necessary for breeding and egg laying.

115.    The Yazoo Pumps would reduce the amount of surface water that reaches these floodplain habitats making it difficult for amphibian and reptile populations to survive and thrive. As documented in the Veto, the hydrological alterations due to the Yazoo Pumps would "adversely impact approximately 21 species of amphibians and 32 species of reptiles by disrupting their reproductive cycles and feeding opportunities and thereby reducing overall productivity." That decline in amphibian and reptile populations would, in turn, impact food resources for other species that prey on amphibians and reptiles.

116.    The Veto explicitly faulted the 2007 FSEIS for excluding entirely any assessment of the proposed project's adverse impacts on amphibians and reptiles. Yet, the 2024 FEIS did not analyze the impacts of the 2024 Plan on any amphibians, and did not assess the impacts to thirty-one of the thirty-two reptile species.

C.      The 2024 FEIS Failed to Analyze the Cumulative Impacts of the 2024 Plan.

117.    Over recent decades, there have been significant wetland losses throughout the Lower

Mississippi River Alluvial Valley (the "LMRAV"), Mississippi Delta, and Yazoo Backwater

Area, primarily due to flood control projects.  The Veto thus underscores the fact that the Yazoo

Pumps' impacts "must be viewed in the context of the significant cumulative losses across the

LMRAV, which has already lost over 80 percent of its bottomland forested wetlands."  That

analysis is especially important given that the Yazoo Backwater Area contains the "largest

remaining . . . complex of bottomland hardwood forests," including crucial habitat for numerous

bird species that rely on the Yazoo Backwater Area and are projected to lose more than fifty

percent of their population in the next fifty years.

118.    The 2024 FEIS, however, disclaimed any cumulative impacts from the 2024 Plan for two

reasons.  First, the 2024 FEIS denies the significant loss of wetlands in the Yazoo Backwater

Area on the grounds that flood levels have "merely contracted and expanded" over time without

any net loss of wetlands.  This ignores the well-recognized, significant loss of wetlands in the

project area documented in the Veto as well as a post-Veto study released by the U.S. Fish and

Wildlife Service which documents that the Yazoo Backwater Area lost 11 percent of its

remaining forested wetlands from just the 1970s to 2006.

119.    Second, the 2024 FEIS asserts that the 2024 Plan's impacts would "be neutral as to

wetland resources," and thus there are no cumulative impacts of concern.  But that overlooks the

2024 Plan's degradation of more than 92,867 acres of wetlands.  It also overlooks significant

impacts to fisheries, migrating waterfowl, breeding waterfowl, amphibians, and reptiles, which

the 2024 FEIS either severely underestimated or entirely failed to consider.

**D.     The Corps Refused to Obtain an Independent External Peer Review.**

120.    The Conservation Organizations repeatedly highlighted the requirement for an

independent external peer review of the 2024 draft environmental impact statement, and

requested that the Corps obtain that independent peer review to ensure the accuracy of the

analysis.

121.    The Conservation Organizations requested an independent external peer review because

it is required by law for two reasons.  First, the 2024 Plan would cost over two hundred million

dollars.  In fact, the 25,000 cfs pumping station—which would be one of the largest hydraulic

pumping stations in the world—could cost upwards of two billion dollars.  Second, the 2024

Plan is highly controversial, as exemplified by the fact that the Yazoo Pumps is one of only

thirteen projects stopped through EPA's veto authority due to the project's unacceptable adverse

impacts.

122.    The Corps, however, refused to obtain an independent external peer review.  It claimed

that an independent external peer review was not required because the 2024 FEIS "is not a

feasibility study or reevaluation report," and thus does not fit the definition of a "project study"

subject to peer review.  But the 2024 FEIS is a "study associated with a modification of a water

resources project," namely the Yazoo Backwater Area Pumps Project, and thus fits within the

definition of a "project study" that must undergo independent external peer review.

**VII.    EPA Incorrectly Asserted that the 2024 Plan Does Not Violate the Veto.**

123.    On November 19, 2024, the Corps' Acting Assistant Secretary of the Army sent a letter to

EPA's Principal Deputy Assistant Administrator acknowledging that "[p]umping stations in the

Yazoo Backwater were subject to the Clean Water Act section 404(c) Final Determination issued

by EPA in 2008."  The Acting Assistant Secretary of the Army requested a determination from

EPA regarding whether the Veto "applies to the pumping station that is proposed in the Recommended Plan as described in the [2024] FEIS."

124.    On January 8, 2025, EPA's Principal Deputy Assistant Administrator responded to the Corps with a letter and enclosed attachment setting forth EPA's conclusion that the Veto "does not apply to the 2024 Plan for the Yazoo Pumps Project" (the 2025 Decision).

125.    The 2025 Decision focused solely on two components of the Veto: whether the project lies within the Veto's "defined area" and whether the project involves the "prohibited discharges" identified by the Veto.

126.    EPA concluded that the project lies within the Veto's "defined" area.  In fact, just like the 2007 Plans for the Yazoo Pumps, the "2024 Plan for the Yazoo Pumps Project is also proposed to be located at the Steele Bayou site adjacent to the Steele Bayou [water control structure]."

127.    EPA, however, concluded that the "discharges from the 2024 Yazoo Pumps are not prohibited by the [Veto]," even though the 2024 Plan would cause "total wetland impacts . . . within the range" prohibited by the Veto and even though construction of the 2024 Plan incorporates the previously planned pumping station, including the same discharges for the same structures at the same locations prohibited by the Veto.

###    A.    The 2025 Decision Violates the Plain Terms of the Veto.

128.    In the 2025 Decision, EPA acknowledged that the 2024 Plan would adversely impact "approximately 92,867 acres of wetlands." It further acknowledged those "total wetland impacts (direct and secondary/indirect) are within the range discussed in the [Veto]."  However, EPA rejected these impacts as having any bearing on its analysis, concluding that the Veto does not apply to the 2024 Plan "regardless of the level of estimated impacts."

129.    EPA ignored the 2024 Plan's unacceptable adverse impacts on the grounds that only "small modifications" to the Yazoo Pumps' "operational features" are prohibited by the Veto

while "more than small" modifications are not prohibited even where they result in far greater adverse impacts that violate the terms of the Veto.

130.    Nothing in the Veto condones EPA's approach of ignoring the fact that the 2024 Plan would adversely impact wetlands far in excess of the amount deemed unacceptable by the Veto and contrary to the Clean Water Act.

131.    EPA ignored the 2024 Plan's unacceptable adverse impacts based on the Veto's statement that "derivatives of the prohibited projects that involve only small modifications to the operational features or location of these proposals would also likely result in unacceptable adverse effects and would generate a similar level of concern and review by EPA."  EPA properly acknowledged that this Veto language prohibits "the 2007 Plan as well as future plans with 'small modifications' to the operational features of the 2007 Plans" due to their unacceptable adverse impacts.  But EPA then ignored the self-evident fact that the Veto prohibits "more than small" modifications to the operational features of the 2007 Plans that would cause unacceptable adverse impacts prohibited by the Veto.

132.    The 2025 Decision also ignores EPA's own interpretation of this Veto text in its 2021 Letter, which correctly explained that "'small modifications to the [Yazoo Pumps'] operational features" that "do not result in significant reductions in the environmental impacts of the project . . . would also likely result in unacceptable adverse impacts" prohibited by the Veto.  Here, the 2024 Plan proposes modifications to the Yazoo Pumps' operational features that do not result in significant reductions in adverse impacts below the 28,400-acre level prohibited by the Veto.  To the contrary, the 2024 Plan would cause adverse impacts to wetlands that far exceed the amount deemed unacceptable in the Veto and contrary to the Clean Water Act.

**B.    The 2025 Decision Relied on Several Grounds Rejected by the Veto.**

133.    The 2025 Decision relies on multiple factors firmly rejected by the Veto to determine that the Veto does not apply.  EPA provides no explanation or justification for its improper reliance on these factors.

134.    First, EPA asserted that the 2024 Plan is not subject to the Veto based on the results of a "narrow wetland assessment" of impacts to a "subset" of wetlands within the two-year floodplain provided in the 2024 FEIS.  The Veto, however, expressly rejected that narrow wetland assessment approach because it led to "a significant underestimation of the proposed pumping station's adverse impacts" on wetlands and fisheries.  Moreover, even in that unduly constrained assessment area, the 2024 Plan would adversely impact 34,379 acres of wetlands, which exceeds the 28,400-acre amount of wetland impacts deemed unacceptable by the Veto.  Furthermore, the 2024 FEIS's "more comprehensive estimate of impacts" shows that the 2024 Plan would adversely impact at least 92,867 acres of wetlands.

135.    Second, EPA asserted that the 2024 Plan is not subject to the Veto because the "pumping elevations" in the 2024 Plan are "considerably different" from the 2007 Plans.  That assertion, however, overlooks the direct overlap in the plans' pumping elevations during the critical fish spawning and rearing season in early spring and summer.  The 2007 Plan 7 proposed a 14,000 cfs pumping station with a pump-on elevation of 91 feet, including during the period from March 25 to October 15, which the Veto prohibited due to the unacceptable adverse impacts on spawning and rearing habitat.  During that same crucial timeframe, the 2024 Plan proposes a pump-on elevation of 89.5 feet, which is significantly *lower* than the 91-foot level prohibited by the Veto.  In fact, the 2024 Plan makes the problem worse by operating a far larger and more powerful 25,000 cfs pumping plant to reduce water levels to an even lower level during that critical timeframe for spawning and rearing.

136.    Third, EPA asserts that the Veto does not apply because the 2024 Plan provides "environmental benefits" associated with the "proposed management of the Steele Bayou [water management feature]."    The Veto, however, rejected that precise argument as "irrelevant" because operation of the Steele Bayou water management feature is "not dependent upon construction of any pumping station."    EPA again rejected this precise argument as being irrelevant in 2021 when it rejected the Corps' prior attempt to circumvent the Veto based on the 2020 Plan.

137.    Fourth, EPA relied on an impacts assessment that failed to evaluate impacts to fisheries as required by the Veto.  In reaching its 2025 Decision, EPA relied on the fisheries impacts identified in the 2024 FEIS, even though it failed to assess the 2024 Plan's impacts on any spawning and rearing habitat in the floodplain.  As a result, EPA overlooked additional adverse impacts to fisheries caused by the 2024 Plan, which exacerbate the 2024 Plan's unacceptable adverse impacts.

138.    Furthermore, EPA relied on the 2024 FEIS even though it only considered impacts to fish spawning using an eight-consecutive-days parameter—an approach rejected by the Veto because "eight days is insufficient for any substrate spawning fish to spawn."  EPA relied on that erroneous approach without even acknowledging, let alone addressing, its longstanding concerns about using an eight-consecutive-days parameter.

139.    Fifth, EPA relied on the impacts identified in the 2024 FEIS even though it failed to evaluate impacts to any amphibians and failed to evaluate impacts to thirty-one of thirty-two reptile species—yet another error rejected by the Veto.  As a result, the 2024 FEIS overlooked impacts to these species, committing the same error highlighted in the Veto.  EPA, nonetheless, relied on the 2024 FEIS without acknowledging, let alone addressing, the shortfalls in that

analysis despite its longstanding concerns about the Yazoo Pumps' adverse impacts on reptiles and amphibians, which were fully documented in the Veto.

### C. The 2025 Decision Failed to Ensure Future Operational Changes Would Not Result in Even Greater Unacceptable Adverse Impacts.

140.    The 2025 Decision acknowledged that "it is not uncommon for the Corps to make changes to its water control plans" after a project is constructed.  In fact, the Corps has received multiple requests to alter the operating features of the 2024 Plan, including to operate the pumps for longer periods of time at the lower pump-on elevation of 89.5 feet.

141.    Even small changes in the 2024 Plan's operational features can have significant, far-reaching adverse impacts on wetlands and fisheries.  For example, the 2024 FEIS analyzed an alternative pump-on elevation of 90 feet from March 16 to October 15, which is nine days earlier than the 2024 Plan.  That small difference would degrade an additional 3,467 acres of wetlands, thereby exacerbating the unacceptable adverse impacts on fisheries and wildlife.  It would also cause significantly greater impacts on fisheries because the earlier operating season would further limit flooding during the crucial spawning and rearing season in spring.

142.    Nonetheless, EPA greenlighted construction of the Yazoo Pumps without first ensuring that future changes to the 2024 Plan's operational features would not cause unacceptable adverse impacts in violation of the Veto.  EPA stated that the 2025 Decision "does not address the applicability of the [Veto] to any potential future plans, including modifications to the [2024] Plan, that the Corps may propose."

143.    Once the pumps are constructed, however, EPA would no longer have Section 404(c) veto authority as the discharges of dredged and fill material will be complete.  It was thus incumbent on EPA to ensure against such unacceptable adverse impacts *before* allowing construction of a far-larger pumping station.

144.    Instead, EPA claimed that the "main consideration" in allowing the Yazoo Pumps to proceed was the "assurances" the Corps provided in a Memorandum of Agreement (the "MOA") concerning modifications to the Yazoo Backwater Pumps operating plan.

145.    The MOA acknowledges that the 2024 Plan "may be revised" by the Corps "as necessary, to conform with changing requirements resulting from development in the project area and downstream, improvements in technology, new legislation, the results of monitoring and adaptive management, and other relevant factors, provided such provisions comply with existing federal regulations and established [Corps] policy and are done in concert with the EPA and the [U.S. Fish & Wildlife Service], as described below."

146.    The MOA does not require the Corps to obtain EPA's determination that revisions to the 2024 Plan, let alone the 2024 Plan itself, will not cause unacceptable adverse impacts in violation of the Veto.

147.    The MOA also is "not legally binding, does not create any contractual obligations, and is not enforceable by any party."  In addition, the MOA obligates the signatory agencies to "review[]" the agreement in ten years without any requirement for renewal.

**D.    The 2025 Decision Failed to Distinguish the Prohibited Discharge Element of the Veto.**

148.    The 2025 Decision asserted that the "discharges from the 2024 Yazoo Pumps are not prohibited by the [Veto]."  But that runs directly contrary to the fact that the 2024 Plan proposes the construction of a much larger pumping station that, by its very design, includes the same discharges at the same location for the same structures as prohibited by the Veto.

149.    The 2024 Plan expands on the original design of the 14,000 cfs pumping station by adding additional pumping units that almost double its capacity to 25,000 cfs.  As explained in the 2024 FEIS, this "updated design is based on the previous pump station design at the Steele

Bayou pump site."  Accordingly, the "major structures" of the 25,000 cfs pumping station "will be largely unchanged from the previous design" for a 14,000 cfs pumping station.

150.    Construction of the expanded pumping station will involve discharges of dredged and fill material adjacent to the Steele Bayou structure for construction of the inlet channel, outlet channel, pump station, and site work.

151.    Construction of the 25,000 cfs pumping station would involve even more discharges than those identified in the 2007 Plans and prohibited by the Veto.  For example, the increase in pumping station capacity requires an additional one million cubic yards of fill material (on top of the approximately one million cubic yards needed for the 14,000 cfs design).  That is equivalent to approximately 33,333 extra dump trucks each carrying 30 cubic yards of fill material.

   E.    **The 2025 Decision Failed to Address the Flaws in the Compensatory Mitigation Plan.**

152.    The 2025 Decision provided a "separate evaluation" of the compensatory mitigation proposed in the 2024 Plan.  The 2024 Plan proposes up to 5,722 acres of wetland restoration and 403 acres of "moist soil units" to compensate for the adverse impacts on at least 92,867 acres of wetlands.

153.    EPA did not rely on the compensatory mitigation as a basis for concluding that the Veto does not apply to the 2024 Plan for the Yazoo Pumps.

154.    The 2025 Decision acknowledged the need to address the "extensive deficiencies with the compensatory mitigation proposed to address the impacts of the 2007 Plans."  The Veto found that the proposed mitigation in the 2007 Plans was inadequate because impacts to wetlands and fisheries habitat "were underestimated for several reasons."  In addition, the Veto found that the 2007 Plans lacked "critical details" that must be included in "a comprehensive and detailed mitigation plan" to ensure impacts will in fact "be reduced permanently below the threshold of

significant degradation." Due to these inadequacies, the Veto did not believe that "the potential impacts of the Yazoo Backwater Area Project can be adequately mitigated to reduce the impacts to an acceptable level."

155.    The 2024 Plan does not address the deficiencies identified in the Veto.

156.    The 2024 FEIS failed to assess the impacts of the 2024 Plan on fish spawning and rearing habitat in the one-year and two-year floodplains and above, and thus failed to ensure the mitigation in the 2024 Plan is adequate to offset these impacts. The 2024 FEIS failed to assess the full array of critical impacts of the 2024 Plan on birds, and thus failed to ensure that the 2024 Plan is adequate to offset these impacts. The 2024 FEIS also failed to assess the impacts of the 2024 Plan on amphibians and reptiles, and thus also failed to ensure the mitigation in the 2024 Plan is adequate to offset these impacts.

157.    The 2024 FEIS also failed to ensure the 2024 Plan's mitigation offset the pumps' impacts on specific wetland functions. Instead, the 2024 FEIS only assessed whether the 2024 Plan offset the loss of "average annual functional capacity units." However, EPA has repeatedly rejected that approach, including in the Veto, explaining that "it does not ensure that specific functions will be adequately replaced because all functions are lumped together in the Average Annual Functional Capacity Unit calculation." EPA disregarded these longstanding concerns.

158.    The 2024 Plan lacks the "critical details" identified by EPA as necessary to ensure impacts will in fact "be reduced permanently below the threshold of significant degradation." Instead, EPA claimed that the Corps' reliance on the "Mississippi Delta – In-Lieu Fee program will ensure that the regulatory requirements for mitigation planning are being addressed."

159.    The Mississippi Delta – In-Lieu Fee Program did not, however, have a final approved amendment to provide mitigation credits for the Yazoo Pumps prior to the Corps' issuance of the ROD.

160.    In the 2025 Decision, EPA relied on a Draft Instrument Amendment to add the Yazoo Backwater Preserve Project to the Ducks Unlimited Mississippi Delta – In-Lieu Fee Program (hereinafter, "Draft Amendment").

161.    The Draft Amendment lacks the "critical details" demanded by the Veto, such as a functional assessment of the proposed mitigation sites, ecological performance standards to ensure the proposed compensation replaces lost functions due to the 2024 Plan, site-specific mitigation plans, or detailed monitoring requirements.  Without those details, it is "impossible to conclude that impacts will be reduced permanently below the threshold of significant degradation."

**VIII.    The Corps Approves the 2024 Plan.**

162.    On January 15, 2025, the Corps signed a Record of Decision that recommends construction and operation of the Yazoo Pumps pursuant to the 2024 Plan.

163.    The Corps relied on EPA's 2025 Decision and the 2024 FEIS to conclude that the 2024 Plan is in accordance with the Veto and environmental statutes.

### FIRST CLAIM FOR RELIEF

**EPA's 2025 Decision Violates the Veto and Clean Water Act**
**(33 U.S.C. § 1344)**

164.    The Conservation Organizations incorporate by reference all of the preceding paragraphs.

165.    The Administrative Procedure Act provides that a court must "hold unlawful and set aside" final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

166.    Congress vested EPA with authority under Clean Water Act Section 404(c) "to prohibit

the specification of an area" for the discharge of dredged and fill material "whenever [EPA]

determines" that the discharge "will have an unacceptable adverse effect" on "fishery areas

(including spawning and breeding habitat), wildlife," or other enumerated resources.  33 U.S.C.

§ 1344(c).

167.    A Section 404(c) veto has two core components.  First, the veto sets forth EPA's

determination that a proposed project "will have an unacceptable adverse effect on . . . fishery

areas (including spawning and breeding habitat), wildlife," or other enumerated resources.  *Id.*;

*see also* 40 C.F.R. § 231.2(e) (defining "unacceptable adverse effect").  Second, the veto

identifies the "discharge" of dredged and fill material that is prohibited by the veto to prevent

those unacceptable adverse effects from occurring. 33 U.S.C. § 1344(c).

168.    Pursuant to Section 404(c), EPA vetoed the Yazoo Pumps because the construction and

subsequent operation of the pumps would cause unacceptable adverse impacts on fisheries and

wildlife.  The first component of the Veto sets forth EPA's extensive findings showing that

"wetland impacts between approximately 28,400 and 118,400 acres" would cause "significant

and unacceptable" adverse impacts on fisheries and wildlife.   The Veto identified that "range of

impacts" as the benchmark for prohibiting every operating plan proposed by the Corps that

included a 14,000 cfs pumping station and adversely impacted more than 28,400 acres of

wetlands.  The second component of the Veto prohibits the discharge of dredged or fill material

for the purpose of "construction" of those plans, all of which involved a 14,000 cfs pumping

station near the Steel Bayou flood control gates.

169.    The 2024 Plan violates both components of the Veto.  First, the 2024 Plan would expand

the pumping station to 25,000 cfs and operate it in a way that would adversely impact at least

92,867 acres of wetlands, which is more than three times the amount of adverse wetland impacts deemed unacceptable by the Veto.  Second, the 2024 Plan proposes the construction of a much larger version of the Yazoo Pumps that, by its very design, includes the discharges prohibited by the Veto.

170.    In short, the 2024 Plan violates the Veto.  EPA's 2025 Decision to approve the 2024 Plan must therefore be declared unlawful and "set aside" as contrary to Clean Water Act.

### SECOND CLAIM FOR RELIEF

**EPA's 2025 Decision is Arbitrary and Capricious Because
EPA Entirely Overlooked Important Aspects of the Problem
(5 U.S.C. § 706)**

171.    The Conservation Organizations incorporate by reference all of the preceding paragraphs.

172.    The Administrative Procedure Act provides that a court must "hold unlawful and set aside" final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

173.    The 2025 Decision is arbitrary and capricious because EPA "entirely failed to consider . . . important aspect[s] of the problem" and failed to "articulate a satisfactory explanation for [its] action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 52.

174.    First, EPA explicitly acknowledged that the 2024 Plan would cause "total wetland impacts . . . within the range" deemed unacceptable by the Veto and contrary to the Clean Water Act.  Yet, EPA brushed aside the 2024 Plan's unacceptable adverse impacts, thereby overlooking those critical facts and entirely failing to consider the relevant factor in the Veto and Section 404(c).

175.    Second, EPA chose to ignore the 2024 Plan's unacceptable adverse impacts based on a flawed—indeed absurd—reading of the Veto.  In essence, the 2025 Decision argues that only "small modifications" to the Yazoo Pumps' "operational features" are prohibited by the Veto

because they cause unacceptable adverse impacts, while "more than small" modifications are not prohibited even where they result in far greater unacceptable adverse impacts. That argument finds no support in the Veto; in fact, it runs contrary to the Veto's explicit determination that adverse impacts to more than 28,400 acres of wetlands are unacceptable and contrary to the Clean Water Act. The 2024 Plan's unacceptable adverse impacts are not grounds to distinguish the Veto, but instead confirm that the 2024 Plan violates the Veto.

176.    Third, EPA failed to ensure that the 2024 Plan would not cause unacceptable adverse impacts in violation of the Veto. Instead, EPA's 2025 Decision relied on multiple factors firmly rejected by the Veto because they either significantly understate or entirely fail to consider the adverse impacts of the Yazoo Pumps. EPA also failed to analyze critical impacts to wildlife (such as the impacts to millions of migratory and breeding birds that rely on the Yazoo Backwater Area and numerous species of amphibians and reptiles) and failed to analyze critical impacts to fish spawning and rearing habitat, even though they are enumerated resources protected by the Veto and Clean Water Act. Finally, EPA failed to ensure that future operational changes to the Yazoo Pumps would not result in even greater adverse impacts in violation of the Veto.

177.    Fourth, EPA erroneously argued that it need not consider the 2024 Plan's unacceptable adverse impacts because the 2024 Plan does not involve the "prohibited discharges" identified in the Veto. But the prohibited discharge element is plainly met as construction of the 2024 Plan involves the same discharges in the same location for the same structures as prohibited by the Veto. EPA provides no explanation in its 2025 Decision as to why this fundamental overlap does not trigger the prohibited discharge element of the Veto.

178.    For these reasons and others, EPA's 2025 Decision should be vacated and "set aside" as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).

### THIRD CLAIM FOR RELIEF

**The Corps' Decision to Authorize the 2024 Plan**
**Violates the Veto and Clean Water Act**
**(33 U.S.C. § 1344)**

179.    The Conservation Organizations incorporate by reference all of the preceding paragraphs.

180.    Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

181.    The Clean Water Act authorizes the EPA Administrator to "prohibit the specification … of any defined area as a disposal site" whenever he or she determines the discharge will "have an unacceptable adverse effect on" various resources, including "fishery areas" and "wildlife."  33 U.S.C. § 1344(c); see also 40 C.F.R. § 231.1(a).

182.    EPA exercised its authority under Section 404(c) of the Clean Water Act to prohibit the specification of the wetlands and other waters of the United States in the Yazoo Backwater Area as a disposal site for the discharge of dredged or fill material for the purpose of construction of the Yazoo Pumps and all the alternatives proposed by the Corps that included a pumping station and would adversely impact more than 28,400 acres of wetlands.

183.    The Veto is a final agency action that prohibits the Corps from allowing any discharges inconsistent with the Veto.  33 U.S.C. § 1344; 40 C.F.R. § 231.6.

184.    The 2024 Plan violates the Veto because it would cause adverse impacts far in excess of the amount deemed unacceptable by the Veto.  Furthermore, the 2024 Plan proposes to construct an even larger, 25,000 cfs pumping station, which will include the same discharges of dredged and fill material for the same structures at the same location as prohibited by the Veto.

185.    Accordingly, the Corps' Record of Decision approving the 2024 Plan for the Yazoo Pumps was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance" with the Veto and Clean Water Act.  5 U.S.C. § 706(2)(A). The Corps' decision therefore should be set aside under the Administrative Procedure Act.  *Id.*

### FOURTH CLAIM FOR RELIEF

#### The Corps Failed to Demonstrate the 2024 Plan
#### Is the Least Environmentally Damaging Practicable Alternative
#### (33 U.S.C. §§ 1251 *et seq.* and 5 U.S.C. § 706)

186.    The Conservation Organizations incorporate by reference all of the preceding paragraphs.

187.    Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To that end, the Clean Water Act prohibits the unpermitted discharge of any pollutant, including dredged or fill material, into waters of the United States.  *Id*. § 1311(a).  Before allowing the discharge of dredged or fill material into waters of the United States, including for the Corps' own civil works projects, the Corps must comply with the Section 404(b)(1) Guidelines.  *See* 40 C.F.R. Part 230.

188.    The Section 404(b)(1) Guidelines prohibit the Corps from allowing the discharge of any dredged or fill material into waters of the United States if there is a less-environmentally-damaging practicable alternative.  *See* 33 C.F.R. § 336.1(c); *See* 40 C.F.R. § 230.10(a).  Practicable alternatives include "[a]ctivities which do not involve a discharge of dredged or fill material."  40 C.F.R. § 230.10(a)(1)(i).  Where a discharge is proposed for a "special aquatic site," such as a wetland, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise.  *Id*. §§ 230.10(a)(3), 230.41.

189.    The public identified less-environmentally-damaging practicable alternatives to the Yazoo Pumps, including the Resilience Alternative, which would provide prompt, effective,

sustainable, and environmentally sound relief to communities in the Yazoo Backwater Area. The Resilience Alternative meets the basic project purpose and would avoid the destruction or modification of any special aquatic sites, and thus is both presumed to, and would in fact, have less adverse impacts on the aquatic ecosystem.

190.    The Corps, however, refused to consider the Resilience Alternative in the 2024 FEIS. Furthermore, the Corps eliminated from consideration a limited "non-structural" alternative based on four assertions that are not only conclusory but disregard the Resilience Alternative's suite of solutions.

191.    The Corps violated the Section 404(b)(1) Guidelines by failing to demonstrate that the 2024 Plan is the least-environmentally-damaging practicable alternative. Accordingly, the Corps' Record of Decision approving the 2024 Plan was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance" with the Clean Water Act and Section 404(b)(1) Guidelines. The Corps' decision therefore should be set aside under the APA. 5 U.S.C. § 706(2)(A).

## FIFTH CLAIM FOR RELIEF

### The Corps Violated the National Environmental Policy Act
### (42 U.S.C. § 4332)

192.    The Conservation Organizations incorporate by reference all of the preceding paragraphs.

193.    The National Environmental Policy Act requires the preparation of a "detailed statement"—that is, an environmental impact statement—that analyzes the "reasonably foreseeable environmental effects of the proposed agency action." 42 U.S.C. § 4332(2)(C)(i).

194.    Courts have long held that NEPA requires an analysis of "the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results

from its contribution to existing adverse conditions or uses in the affected area." *Hanly v.
Kleindienst*, 471 F.2d at 830–31.

195.    NEPA also requires agencies to analyze a "reasonable range of alternatives to the
proposed agency action," 42 U.S.C. § 4332(2)(C)(iii), which ensures that the decision maker
"has before him and takes into proper account all possible approaches to a particular project,"
*Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1114
(D.C. Cir. 1971).  By requiring consideration of alternatives, NEPA aims to ensure that the "most
intelligent, optimally beneficial decision will ultimately be made."  *Id.*

196.    A comprehensive assessment of impacts to fish and wildlife is particularly critical
because EPA issued the Veto in recognition of the fact that the Yazoo Pumps "would result in
unacceptable adverse effects on fishery areas and wildlife."  Indeed, the Veto "is based solely on
environmental harms to fisheries and wildlife in the Yazoo Backwater Area" as "is appropriate
given the structure and language of the [Clean Water Act] and case law."

197.    The Corps nevertheless failed to assess the 2024 Plan's reasonably foreseeable impacts
on fisheries, birds, waterfowl, amphibians, and reptiles that inhabit and rely on the Yazoo
Backwater Area's wetlands and other aquatic resources.  Rather than analyzing the extensive
impacts to those species, the 2024 FEIS instead completely ignores impacts to many species by
restricting its analysis to a mere fraction of the pumps' actual impacts.

198.    The 2024 FEIS also failed to analyze the 2024 Plan's cumulative impacts on the wetlands
and wildlife of the Yazoo Backwater Area, even though the Veto expressly instructed the Corps
to consider the impacts of the pumps in the context of the significant cumulative losses of
wetlands across the Lower Mississippi River Alluvial Valley, Mississippi Delta, and Yazoo
Backwater Area.  Instead, the 2024 FEIS disclaimed any cumulative impacts based on two

statements that simply deny the magnitude of the problem, and thus fail to ensure that the 2024

Plan's unacceptable adverse impacts to an additional 92,867 acres of wetlands will not be the

proverbial "straw that breaks the back of the environmental camel." *Hanly*, 471 F.2d at 831.

199.    Furthermore, the 2024 FEIS failed to consider reasonable alternatives to the proposed

project, including the Resilience Alternative.  The Corps also eliminated from consideration a

limited "non-structural" alternative based on four assertions that are not only conclusory but

disregard the Resilience Alternative's suite of solutions.

200.    These failures violate the National Environmental Policy Act and are "arbitrary,

capricious, an abuse of discretion or otherwise not in accordance with law."  5 U.S.C.

§ 706(2)(A).  The Corps' Record of Decision approving the 2024 Plan therefore should be set

aside under the Administrative Procedure Act.  *Id.*

**SIXTH CLAIM FOR RELIEF**

**The Corps Failed to Subject the 2024 FEIS**
**to Mandatory Independent External Peer Review**
**(33 U.S.C. § 2343 and 5 U.S.C. § 706)**

201.    The Conservation Organizations incorporate by reference all of the preceding paragraphs.

202.    The Water Resource Development Act requires the Corps to subject "project studies" to

"a peer review by an independent panel of experts" if the project's total costs, including

mitigation costs, exceed two hundred million dollars or if the project is "controversial."  33

U.S.C. § 2343(a)(3)(A)(i), (iii).

203.    A project is controversial if "there is a significant public dispute as to the size, nature, or

effects of the project" or "there is a significant public dispute as to the economic or

environmental costs or benefits of the project."  *Id.* § 2343(a)(4).

204.    The 2024 FEIS is a project study that triggers a mandatory independent external review

because it evaluates modifications to a water resources project that will cost over two hundred

million dollars and that is unquestionably controversial, both in terms of environmental impacts and economic costs.  In fact, the 2007 FSEIS estimated the pumps' costs at two hundred twenty million dollars, which has likely ballooned to two billion dollars, if not more.

205.    The Corps violated the law by failing to undertake an independent external peer review during the drafting process for the 2024 FEIS.  33 U.S.C. § 2343(a)(3)(A)(i), (iii).  Accordingly, the Corps' Record of Decision approving of the Yazoo Pumps was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  The decision therefore should be set aside under the Administrative Procedure Act.  *Id.*

**REQUEST FOR RELIEF**

The Conservation Organizations request that the Court grant the following relief:

A. Declare that EPA's 2025 Decision was arbitrary, capricious, and not in accordance with the Clean Water Act;

B. Vacate and set aside EPA's 2025 Decision;

C. Declare that the Corps' 2024 FEIS and Record of Decision approving the 2024 Plan for the Yazoo Pumps are arbitrary, capricious, and not in accordance with the law;

D. Vacate and set aside the Corps' 2024 FEIS and Record of Decision;

E. Enter appropriate injunctive relief;

F. Award the Conservation Organizations all reasonable costs and attorneys' fees as authorized by law; and

F. Award the Conservation Organizations such other relief as this Court deems just and appropriate.

Dated: June 30, 2025                    Respectfully submitted,

/s/ Stuart C. Gillespie
Stuart C. Gillespie (CO Bar No. 42861)
(*pro hac vice pending*)
Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
Tel.: (303) 996-9616
E-mail: sgillespie@earthjustice.org

*Co-Counsel for Plaintiffs Friends of the Earth,
Sierra Club, and Healthy Gulf*

/s/ Sharmeen Morrison
Sharmeen Morrison (CA Bar No. 360435)
(*pro hac vice pending*)
Earthjustice
180 Steuart Street #194330
San Francisco, CA 94105
Tel.: (415) 217-2005
E-mail: smorrison@earthjustice.org

*Co-Counsel for Plaintiffs Friends of the Earth,
Sierra Club, and Healthy Gulf*

/s/ Kathleen Riley
Kathleen Riley (D.C. Bar No. 1618580)
Earthjustice
1001 G St. NW Suite 1000
Washington, DC 20001
Tel.: (202) 745-5227
Email:  kriley@earthjustice.org

*Local Counsel for Plaintiffs Friends of the Earth,
Sierra Club, and Healthy Gulf*